JAY–KAY PAINT MANUFACTURING
COMPANY, Appellant,

v.

M. M. CARTER, Appellee.

No. 10328.

Court of Civil Appeals of Texas.

Austin.

June 29, 1955.

Rehearing Denied July 27, 1955.

Orgain, Bell & Tucker, David J. Kreager, Beaumont, for appellant.

O'Neal Dendy, San Angelo, for appellee.

ARCHER, Chief Justice.

This suit was instituted by appellee to recover salary for labor performed during the last half of March, 1954, for $325 for the months of April and May, 1954, for breach of a contract of employment for these months, for attorney's fees, interest and costs.

Trial was had with the aid of a jury and judgment, based on findings favorable to plaintiff, was entered for plaintiff for $801.-70 with 6% interest from date of judgment and for costs.

The appeal is before this Court on nine points assigned as error, and are to the effect that there was no evidence to support the jury's answer to Special Issue No. 1, or in the alternative, against the great weight of the credible testimony, and that the employment was terminable at the will of either party, and that the Special Issue as submitted was a comment on the weight of the evidence and advised the jury of the effect of their answer; that Special Issue No. 2 as submitted was a comment on the weight of the evidence in that it assumed plaintiff had a contract for a definite period, and could only be discharged for good cause.

That the definition of "good cause" submitted only tortious good cause as distinguished from contractual good cause, that the court erred in not submitting the correct definition of good cause as submitted by appellant and in giving judgment for attorney's fees.

Special Issue No. 1 reads as follows:

"Special Issue No. 1: Do you find from a preponderance of the evidence

that the contract between the Plaintiff, M. M. Carter, and the Defendant, Jay-Kay Paint Manufacturing Company, was that the Plaintiff was employed as a salesman for Defendant for at least three months' time, beginning March 1, 1954? Answer Yes or No."

The jury answered yes.

Special Issue No. 2 is as follows:

"Special Issue No. 2: Do you find from a preponderance of the evidence that Plaintiff was discharged by Defendant on March 27, 1954, without good cause, as hereinafter defined? Answer Yes or No."

The jury answered yes.

In connection with Special Issue No. 2 the court gave the following definition of good cause.

"By 'good cause' for discharge, as used in this Charge, is meant a failure of the employee to perform those duties in the scope of his employment as a man of ordinary prudence in an industry would have done under the same or similar circumstances."

The plaintiff testified extensively and in part as follows:

"Q. State whatever it was that Mr. Kreager said that he would pay you, and how and when. A. Mr. Kreager agreed to pay me a salary of $325.00 a month to be paid semi-monthly.

"Q. What else was he to pay you? A. He was to pay for the gasoline that I used on company business, greasing the car and for the oil changes.

"Q. All right; and whose automobile were you to use, Mr. Carter? A. I used my own personal car.

"Q. You had to furnish your own automobile? A. Yes, sir.

"Q. Did he pay you anything for the monthly or yearly depreciation of your automobile? A. No, sir.

"Q. Now, did you have any discussion about the length of time that you would work for him? A. Yes, sir. Mr. Kreager agreed after 90 days, that if everything proved out satisfactorily that he would buy a car for the company that I would use on the road.

"Q. Well, now, after 90 days what was your and his agreement with reference to 90 days. A. Our agreement was that I was to try it for 90 days, and if I was happy and if he was happy with my work that we would then change the compensation other than $325.00 a month; he would change it to both our satisfaction.

"Q. All right; and did you agree to work for him for 90 days? A. I did.

*    *    *    *    *

"Q. Then tell the jury what happened on the 27th day of March, 1954. A. After discussion with Mr. Kreager on March 27th, on Saturday afternoon, of my itinerary for each day's work that was turned in, we had a discussion that I wasn't getting the job done, and I told him that I didn't think that three weeks was enough for any man who had never had experience to start producing at a profit. He told me that he couldn't use me any more, that I was through; that was approximately, I'd say, 5:00, perhaps 5:30, on Saturday afternoon. He offered me a check then, which he had not made out. I told him no, that that was quite all right, would just wait until Monday, I'd pick it up Monday. I did not go back for the check, I think it was on the following Tuesday or Wednesday to pick up my check, at which time we had a little discussion over the figures of the check; I walked out of the plant and left the place, having nothing else to say.

"Q. Now then, he offered to pay you how much when you went back for your salary, Mr. Carter? A. He started to make out a check for

$107.48; the gross amount of that check, $121.92, with $2.44 social security, and the withholding tax $12.00, a net of $107.48.

"Q. Now, was that the amount of money that you were entitled to at that time? A. No, sir.

"Q. And did you refuse that check? A. I did."

D. J. Kreager, witness for defendant, testified fully concerning the employment of M. M. Carter, and in part as follows:

"Q. All right. Now, this next time, I believe on Tuesday you said; did you discuss salary with him then? A. Yes.

"Q. What was the conversation about salary then? A. I asked him how much money he thought he ought to earn, and he told me $350.00 a month, so I told him we wouldn't start a man at $350.00 a month and pay his expenses, especially not having had previous paint selling experience. He said what would we pay, and I told him $325.00 a month, and I said we wouldn't go beyond that for a period probably of three months.

"Q. And did you have any conversation as to whether or not it was on a trial basis or whether or not his services would be satisfactory? A. He understood well that it was on a trial basis, because he was begging for the job, and frankly that is why we hired him, was because we had a soft spot in our heart for a guy that claimed he couldn't get employment in San Angelo and would have to leave town to get employment and had to have a job the 1st of March.

"Q. Did he make those statements to you? A. He did make those statements; and I told him—he had called and came by, and so I told him to please don't come by, I would let him know later that week, which I did call him. He came to see me.

"Q. What particularly was said in the conversation as to whether or not his services were to be satisfactory? A. I told him definitely, as I would hire any man, always have hired, that I would hire him on the basis, trial basis, and that if his work was all right, satisfactory, in my opinion, that he would have employment. I said, 'On the other hand, you or I, neither of us know how you will be able to perform because it is not every man that can make a paint salesman, it may be selling cars or something else; you don't know and I don't know,' and I said, 'Frankly, I don't know enough about you because we haven't got any definite information from you so far in your talk; so you say you can sell and we will try you out, and if you do not work out I will pull the cord on you,' in other words, stop his employment. I said, 'On the other hand, you may not like us, you may not like the job, you might find you can't do it and you are welcome to quit any time and there will be no hard feelings.' That is the exact details of the contract, as he calls it, between us.

"Q. Did you at any time guarantee him any certain length of employment? A. I never guaranteed him anything, except I told him $325.00 a month and out of pocket expenses."

■ The testimony is in sharp conflict. The jury saw and heard the witness and resolved the fact issue as to an employment for at least three months in favor of plaintiff and we believe its action finds reasonable support in the record.

North British & Mercantile Ins. Co. v. Arnold, Tex.Civ.App., 171 S.W.2d 215.

The second special issue inquired of the jury if the discharge of plaintiff by defendant was without good cause, and the answer of the jury was yes.

The testimony concerning the discharge of plaintiff as given by the witness Kreager is that Carter appeared listless, not too

agressive and did not develop enough business, and especially

"A. I told Mr. Carter—the first thing I asked him, I said to him, 'Carter, have you been getting an early start on your jobs in the mornings, Mondays?' 'Yes'. I said, 'Well, your sales this past week are no good, and I just don't believe you are going to make it, and for certain reasons I am going to pull the cord on you now, I am going to terminate you today, the 13th of March;' and Mr. Carter seemed a little upset and a little bit high-tempered about it, I assume, seemed that way to me, and he said to me, 'Mr. Kreager, I never judged you to be a man that would make a snap judgment.' I says to him, 'My experience in working people leads me to believe that I have fair knowledge of a man's working ability, what to expect of him, and I just don't believe you will make the job;' and then he started talking to me about the fact that he didn't think he had a fair trial in one week, plus the previous week of training, of course. So we talked for a while and I said to him, 'Well, I am going to let you try it again, try it another week, try it again and we will see.' I said, 'I want to give you a fair chance because I want a salesman.'

"Q. Now, did you terminate his employment then or let him go ahead? A. I let him go ahead."

Carter's employment was terminated on March 27, 1954 and a check for $107.48 mailed to him.

Carter testified as to his efforts in connection with his employment to sell paint, and as to his conversations with Mr. Kreager on the occasion of his discharge.

■ Again the evidence as to good cause was heard by the jury which by its answers found did not exist, and we believe the jury was justified in its finding.

Complaint is made of the use of the word "contract" in the submission of the issues in this case but we do not believe such to be justified.

In appellant's requested definition of good cause the expression "* * * in accordance with his contract of employment * * *" was used.

Then, too, in objecting to the submission of Special Issue No. 1, appellant uses this statement: "* * * and said issue should inquire as to a contract of employment for a period of three months' time certain, beginning March 1, 1954."

■ We therefore do not believe that the issues submitted by the use of the word "contract" are such as would justify a reversal of this case in view of the pleadings and the objections pointed out by appellant.

We believe the charge of the court was a sufficient presentation of the controlling fact issues and the answers of the jury are reasonably supported by the evidence.

Southern Underwriters v. Boswell, 138 Tex. 255, 158 S.W.2d 280; Texas General Indemnity Co. v. Scott, 152 Tex. 1, 253 S. W.2d 651.

Since it does not appear that any attorney's fees or in any event only a very small sum, were allowed, we do not believe it necessary to discuss this issue further.

The judgment was for $801.70 and the gross salary for the two and one half months would be $812.50. The judgment is not itemized, but we assume that social security and withholding taxes will be deducted from the amount of the judgment and paid to the proper receiving authorities.

The judgment of the trial court is affirmed.